CITY OF WHITEHALL *v.* SOUTHERN
MECHANICAL CONTRACTING, INC. and
HIGHLANDS INSURANCE CO.

CA 80-26 599 S.W. 2d 430

Court of Appeals of Arkansas
Opinion delivered May 7, 1980
Released for publication June 4, 1980

*Robert Tolson, Jr.* and *Jones & Petty*, for appellant.

*Coleman, Gantt, Ramsay & Cox*, for appellees.

ERNIE E. WRIGHT, Chief Judge. This is an appeal by the City of Whitehall from a judgment in favor of appellees, Southern Mechanical Contracting, Inc., hereinafter referred to as SMC, and Highlands Insurance Company. SMC brought suit against the City for $32,812.51 unpaid balance of the contract price on a construction contract with the City and $35,000.00 damages. The City denied liability and

counterclaimed for liquidated damages and expenses incurred in completing the contract work. The City also sought judgment against Highlands Insurance Company, the surety on the contractor's bond. Trial before the court without a jury resulted in judgment for SMC against the City for $43,-734.24 and dismissal of the City's action against both appellees.

In October, 1972, SMC entered into a contract with appellant for the construction of a sewer treatment pond and five sewage pump stations for the sum of $125,554.00. The contract required SMC to begin work on or before a date to be specified in a written notice to proceed to be issued by the City, and to complete the contract within 270 consecutive days. The contract contained a liquidated damage clause providing for $110.00 damages per day against the contractor for failure to timely complete the contract.

At the pre-construction conference attended by the parties and the project engineer, it was announced the City would have all land and rights of way acquired by the time notice to proceed was issued. On December 8, 1972, the City and engineer issued notice to SMC to begin work on or before January 4, 1973. On January 3, 1973, SMC was notified by letter from the engineer that all necessary preliminaries were not complete and the prior work order was recalled. On May 23, 1973, the City and engineer issued a new notice to SMC to begin work on or before June 4, 1973.

In January, 1973, SMC had written purchase orders for the equipment for the five pump stations, but the equipment was not the pump stations described in the contract specifications. The engineer declined to approve the equipment until he could be satisfied as to the warranty and suitability of the euqipment. SMC submitted data on the alternate equipment to the engineer on March 5, 1973. Shortly thereafter in March the manufacturer's representative met with the engineer and supplied additional data. The alternate equipment was approved by the engineer on July 6, 1973. The pump station equipment was originally to be delivered by April 30, 1973, but the manufacturer changed delivery date to late Septmeber, 1973. SMC had planned to get the

stations installed during the drier summer months.

Evidence on the part of SMC was that it could not start on the sewer treatment pond in the early summer of 1973 because the City had not acquired the land site for the pond. The court order by which the City acquired the site was obtained on July 27, 1973. While waiting for the notice to proceed with the job SMC undertook other work during the spring of 1973, and the other work was not concluded until sometime in August. SMC started work on the sewer contract August 8, 1973.

Because of delayed delivery of pump equipment and wet winter weather the contractor was unable to get the pump stations installed in the ground until well into 1974. In May of 1974, when the stations were being installed SMC was notified by the engineer that station 5 would be relocated. It developed the City did not own the site where the station was to be finally located, and after the site was acquired the engineer notified SMC by letter dated July 18, 1974, that access to the site was then available and he could proceed with installation. In the letter the engineer complained of the delays and called attention SMC had allowed the pump station equipment to be damaged because of improper storage, and the equipment would have to be checked out by the manufacturer.

There was evidence SMC was unable to obtain adequate fuel on the job in the fall of 1973 because of the oil embargo which occurred subsequent to the bidding of the job. When SMC started work the engineer had not surveyed or staked out the perimeter of the sewer treatment pond, and SMC provided a bulldozer and two men to clear a right of way to enable the engineer to survey and stake the site. Progress was made on constructing the pond during the remainder of 1973 until the work had to be suspended because of rain and winter weather, and work on the pond was resumed in July of 1974.

When the pump stations were installed three phase electric power necessary to operate the stations was not extended to the stations until October, 1974. The power company

would extend service to the sites only on application by the City for permanent service. By the end of May, 1974, all pump stations were in place except number 5.

There was evidence pump station number 4 was out of level and SMC had to dig it out and reset it because an anchor had broken loose from a side of the station. The anchor had been installed as directed by the specifications, and thereafter the contractor used an additional anchoring procedure over and above the specification requirements.

The engineer by letter to SMC dated June 19, 1974, complained of lack of effort to complete the job and that the job was already 111 days overtime and liquidated damages were accruing.

On July 11, 1974 SMC responded to the engineer's letter and pointed out it had not been paid any on the contract since January, 1974, although it had installed four stations in the ground and number 5 would have been installed had the engineer not stopped the installation because of a delayed change in the site location. The City did not own the new site. July 18, 1974, the engineer notified SMC the site for station 5 was then available. It developed the site was in a wooded area near a bluff and required substantial extra work to install. The evidence was the additional cost to the contractor was $1,467.48.

From July through October, 1974, work progressed on the oxidation pond, and sometime during the latter part of that period the engineer required a change in the bottom of the pond to allow for only six inch variation instead of twelve inches as provided in the specifications. Additional work was done by SMC to meet this new requirement, and also a new requirement for a swell to be made to the outlet structure of the pond.

Absent availability of electric power to operate the dehumidifying equipment in the pump stations, all the equipment had to be thoroughly cleaned and repainted at a cost to SMC of $4,066.90.

Three of the pump stations were started on November 27, 1974, with the engineer and manufacturer's representative present. Relays had to be ordered for the other two stations and they arrived on December 17, and were installed on December 19, 1974. All stations were activated and run under automatic controls on December 19 and 20 with the engineer and representative of the manufacturer present.

On December 12, 1974, SMC received a letter dated December 6, 1974, from the City Attorney expressing the intent to terminate the contract if satisfactory arrangements to complete the contract were not made. The letter stated, "In the event of such termination we will again serve notice upon your surety and you."

On December 20, 1974, the City Attorney by telephone ordered SMC off the job. SMC had received three checks from the City on October 28, 1974, as payments on the contract. These and prior checks did not cover substantial labor expenditures and SMC in June, 1974, obtained a loan in the amount of $25,956.63 at ten per cent interest to pay labor costs. The interest to date of trial on that loan was $5,407.62. The evidence was that SMC's costs in digging out and resetting station 4 was $1,580.00 and there was evidence this resulted from a deficiency in the contract specifications as to the anchor for the equipment.

The engineer determined the pond usable as of October 14, 1974, and it was placed in use by the portion of the sewer system operated by gravity on or about that date. Use of the part of the sewer system requiring the pumps did not start until on or about December 19, 1974.

Highlands Insurance Company was never notified of the termination of the contract by the City as required by paragraph 23 of the general conditions of the contract. Under the contract terms the surety was entitled to such notice and to the opportunity to take over and complete any deficiencies in the contract.

The appellant urges six points for reversal, and they are hereinafter separately discussed.

Point I. It is argued the court erred in construing the contract as to SMC's time for performance. The court's opinion recognized the original contract required SMC to complete the work within 270 days from the date specified in the notice to proceed, and that the City had extended that time by 90 days. We find no merit to appellant's contention.

Point II. Appellant contends the court erred in construing the contract as to the time for submission and approval of alternate type pump stations. The contractor submitted the manufacturer's data to the engineer for alternate equipment on March 5, 1973. Later, in March, the manufacturer's representative met with the engineer and supplied additional requested data. The engineer did not give approval of the alternate equipment until July 4, 1973. We cannot say the court erred in holding the delay of approval was an element of delay properly chargeable to the City and the engineer and that this was a factor contributing to the overall delay in the project, as the final order for the equipment could not be placed by the contractor until the engineer had approved the alternate equipment.

Point III. The trial court's finding, "the project was substantially complete in December, 1974," is not clearly against the preponderance of the evidence.

The evidence is undisputed that when the contractor was ordered off the job by the City on December 20, 1974, the oxidation pond was completed to the point that it was being used and had been in use since October, and the 5 pumping stations were tested and activated for automatic operation on December 19 and 20 with a representative of the manufacturer and the engineer present. Thereafter the system has been utilized, although the equipment at times required manual operation of the pump controls and periodic repairs and servicing. The repair of defects in the equipment was within warranty, but the evidence indicates the City did not call on the contractor and the required servicing of the equipment was not performed under warranty. The pond had not been fenced, certain warning signs had not been installed at the pond, the levee banks had not been seeded in bermuda, and certain other minor work and job cleanup needed to be

done as of the time the City terminated the contract. As the contract had been completed to the point it was put into use the finding of the court that the contract was substantially complete was not clearly against the preponderance of the evidence. On the contrary the finding was well supported by the evidence.

Point IV. Appellant contends the court erred in finding that after the City finally provided what was required of it under the contract, it should have permitted SMC a reasonable time to complete its work, and this was not done.

Various delays which the court found to have occurred on the part of the City, or its engineer, are discussed by appellant, and from a review of the evidence, we conclude the court's findings with reference to such delays are well supported by the evidence. The findings of fact by a trial judge sitting as a jury shall not be set aside on appeal unless clearly erroneous. Rule 52, Rules of Civil Procedure. However, we do not discuss the numerous delays since we conclude the delay on the part of the City until July 18, 1974, in providing the location for pump station site 5 amply warrants the court's holding the City was obligated to allow the contractor reasonable additional time to complete the contract. The City madeit impossible for the contractor to timely complete the contract by its delay in relocating the site for the station.

The contract completion date, with the 90 days additional extension given by the City, would have been on or about May 29, 1974, but the site for station 5 was not available to the contractor within that time. In *Townes* v. *Oklahoma Mill Company*, 85 Ark. 596, 109 S.W. 548 (1908), the court said:

> It is an elementary principle needing no citation of authority to support, that there is no breach of a contract where performance is prevented by the conduct of the other party. The party whose own conduct prevents performance of a contract cannot complain of its nonperformance.

In *Royal Manor, et al* v. *B. J. Powell*, 258 Ark. 166, 523

S.W. 2d 909 (1975), the court announced the rule that when a contractor has been prevented by the owner from completing the work, the plaintiff may recover the agreed price less what it would have cost him to complete construction or may recover on a quantum meruit basis.

It was undisputed SMC incurred additional expense incident to the change in location of pump station 5, and there was substantial evidence of additional costs to SMC by other changes in plans and damages from delays caused by the City.

Point V. Appellant argues the court erred in directing a verdict for the surety on the performance bond.

As appellant has failed to establish error in the trial court awarding judgment in favor of SMC, it follows there is no basis for judgment against the surety. Also, the City failed to give notice to the surety as required by express terms of the contract, and thereby failed to afford the surety the opportunity to complete any remaining work under the contract.

Point VI. The trial court did not err in holding the City had waived the time limitation and liquidated damage provisions of the contract.

The posture of the City is untenable in arguing it is entitled to liquidated damages for failure of the contractor to complete the work within the time frame of the contract and ninety day extension when it failed to provide the site for pump station 5 until well after the expiration of the alloted time for completion of the contract. See *Royal Manor, et al* v. *B. J. Powell*, supra and *United States* v. *John Kerns Const. Co.*, 140 F. 2d 792 (8th Cir., 1944).

The burden is on appellant to establish error in the trial court proceedings, and having failed to meet this burden the judgment is affirmed.

Affirmed.